UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF KENTUCKY
LOUISVILLE DIVISION

THE CINCINNATI SPECIALTY
UNDERWRITERS INSURANCE
COMPANY,                                             Petitioner/Counter Defendant,

v.                                        Civil Action No. 3:14-cv-40-DJH-DW

C.F.L.P. 1, LLC,                                       Respondent/Counter Claimant.

\* \* \* \* \*

## **MEMORANDUM OPINION AND ORDER**

Petitioner The Cincinnati Specialty Underwriters Insurance Co. (CSU) filed this action seeking appointment of an umpire to resolve its insurance-coverage dispute with Respondent C.F.L.P. 1, LLC, d/b/a Arcadia Apartments (Arcadia). Currently pending are CSU's motion to appoint an umpire (Docket No. 7) and Arcadia's motion regarding the issues of cosmetic matching and actual cash value (D.N. 53). For the reasons explained below, the Court will appoint Jeff Turley as umpire and will not instruct him that cosmetic matching is required.

**I.    BACKGROUND**

This matter is before the Court pursuant to 9 U.S.C. § 5, which provides:

> If in [an agreement to arbitrate] provision be made for a method of naming or appointing an arbitrator or arbitrators or an umpire, such method shall be followed; but if no method be provided therein, or if a method be provided and any party thereto shall fail to avail himself of such method, or if for any other reason there shall be a lapse in the naming of an arbitrator or arbitrators or umpire, or in filling a vacancy, then upon the application of either party to the controversy the court shall designate and appoint an arbitrator or arbitrators or umpire, as the case may require, who shall act under the said agreement with the same force and effect as if he or they had been specifically named therein; and unless otherwise provided in the agreement the arbitration shall be by a single arbitrator.

CSU issued a commercial property insurance policy to Arcadia effective June 1, 2011 to June 1, 2012. The policy sets forth the following procedure in the event the parties disagree regarding the amount of loss and one party demands an appraisal:

> [E]ach party will select a competent and impartial appraiser. The two appraisers will select an umpire. If they cannot agree, either may request that selection be made by a judge of a court having jurisdiction. The appraisers will state separately the value of the property and amount of loss. If they fail to agree, they will submit their differences to the umpire. A decision agreed to by any two will be binding.

(D.N. 7-2, PageID # 23)

Arcadia, an apartment complex consisting of sixty-eight buildings, filed a claim under the policy for damage resulting from a hail storm in late April 2012. The initial claim, which pertained to roof damage on nearly all of the buildings, is not at issue in this case. (*See* D.N. 53, PageID # 1019) Arcadia subsequently filed another claim, this time for hail damage to the siding on the apartment buildings. CSU issued a payment of $24,522.25 on this claim. (D.N. 7-1, PageID # 19)

Arcadia maintains that all of its buildings had siding damage and that CSU is required to pay for replacement of all the siding on all the buildings so that there will not be obvious differences between old, undamaged siding and patches of new siding. (*See* D.N. 23, PageID # 407-08; D.N. 53, PageID # 1017-18) According to Arcadia, siding panels are no longer available in the size originally used on the buildings (four-and-a-quarter inches), and replacing the faded damaged panels with new four-inch panels would result in an unsightly size and color discrepancy. (D.N. 53, PageID # 1020-21) CSU does not directly contest Arcadia's claim that siding panels are no longer available in the same size; however, it maintains that "comparable siding is available to replace the damaged siding" and that "[t]his is all that is required by the Policy and the law." (D.N. 62, PageID # 1225)

2

Because of this difference in opinion, the parties each chose an appraiser in accordance with the policy. CSU's appraiser, Marty Refka, appraised the siding-damage loss at approximately $29,000, while Arcadia's appraiser, Richard Michelson, determined that the loss was more than $1,000,000. (D.N. 7-1, PageID # 19) Refka and Michelson were unable to agree on an umpire, and so CSU filed this action petitioning the Court to appoint one.[1] (D.N. 1) In addition to the briefing on CSU's motion for appointment of an umpire, the parties have filed competing briefs regarding "the meaning of the governing insurance policy and CSU's obligations to Arcadia under that policy"—specifically, whether the chosen umpire should be instructed that cosmetic matching of the siding is required and how the actual cash value of the damaged property should be determined. (D.N. 53)

## II.   ANALYSIS

The cause of damage and amount of loss are for the umpire to resolve. *See Motorists Mut. Ins. Co. v. Post*, No. 04-487-JBC, 2005 U.S. Dist. LEXIS 24415, at *10 (E.D. Ky. Oct. 20, 2005). The scope of coverage is a legal issue to be decided by the Court. *Id.* Under Kentucky law,

> [t]erms of insurance contracts . . . are to be interpreted according to the usage of the average man and as they would be read and understood by him in the light of the prevailing rule that uncertainties and ambiguities must be resolved in favor of the insured. But this rule of strict construction against an insurance company certainly does not mean that every doubt must be resolved against it and does not interfere with the rule that the policy must receive a reasonable interpretation consistent with the plain meaning and/or language in the contract. When the terms of an insurance contract are unambiguous and not unreasonable, they will be enforced.

---

[1] In its response to the petition, Arcadia asserted a counterclaim alleging breach of the policy, violation of the Kentucky Unfair Claims Settlement Act, and bad faith. (D.N. 8, PageID # 43-46) It also seeks a declaratory judgment as to the rights of the parties under the policy. (*Id.* at 5 ¶¶ 25-28)

3

*The Woods Apartments, LLC v. U.S. Fire Ins. Co.*, No. 3:11-CV-41-H, 2013 U.S. Dist. LEXIS 105582, at *4 (W.D. Ky. July 29, 2013) (quoting *Ky. Ass'n of Ctys. All Lines Fund Tr. v. McClendon*, 157 S.W.3d 626, 630 (Ky. 2005)). The Court finds that under a reasonable reading of the policy at issue here, CSU is not required to pay for cosmetic matching.

      A.      **Arcadia's Motion and Memorandum Regarding Legal Issues Concerning the Meaning of the Governing Insurance Policy and CSU's Obligations (D.N. 53)**

Arcadia requests that the umpire be instructed (1) that cosmetic matching is required and (2) that the actual cash value of the damaged property is to be determined using the broad evidence rule. While application of the broad evidence rule may be appropriate, Arcadia has not shown that it should prevail on the matching issue.

      1.      **Actual Cash Value**

Early in the litigation, the parties disagreed as to whether the policy was an actual cash value policy or a replacement cost policy. Arcadia argued it was the latter. (*See* D.N. 17, PageID # 72 ("[T]he herein policy is a replacement cost policy.")) However, Arcadia now concedes that the policy is an actual cash value policy. This distinction is significant.

The purpose of replacement cost coverage is "to remedy the shortfall in coverage which results under a property insurance policy compensating the insured for actual cash value alone." Steven Plitt et al., *Couch on Insurance* § 176:56 (3d ed. 2014). Unlike an actual cash value policy, replacement cost coverage entitles the insured to the amount necessary to replace the damaged property, "without deduction for deterioration, obsolescence, and similar depreciation of the property's value." *Id.* A provision in an actual cash value policy that "give[s] the insurer the option to repair, restore, or replace the damaged property in lieu of paying for the insured loss" is not the same as replacement cost coverage. Rather, "the issue under 'repair or replace' options . . . is essentially whether the insurer can satisfy its obligation by paying *less* than actual

4

cash value; 'replacement cost' provisions, on the other hand, address whether the insurer is essentially obligated to pay *more* than the actual cash value." *Id.* § 176:1 (emphasis added).

Under the policy at issue here, CSU is obligated to "pay for direct physical loss of or damage to Covered Property . . . caused by or resulting from any Covered Cause of Loss." (D.N. 53-1, PageID # 1071) It is undisputed that hail damage is a Covered Cause of Loss. (*See id.* at 7) "Covered Property" is defined, in pertinent part, as "Building, meaning the structure described in the Declarations." (*Id.* at 37)

The "Loss Payment" provision of the policy provides, in pertinent part:

> In the event of loss or damage covered by this Coverage Form, at our option, we will either:
>
> (1) Pay the value of lost or damaged property;
> (2) Pay the cost of repairing or replacing the lost or damaged property . . . ;
> (3) Take all or any part of the property at an agreed or appraised value; or
> (4) Repair, rebuild or replace the property with other property of like kind and quality . . . .
>
> We will determine the value of lost or damaged property, or the cost of its repair or replacement, in accordance with the applicable terms of the Valuation Condition in this Coverage Form or any applicable provision which amends or supersedes the Valuation Condition.

(D.N. 7-2, PageID # 24) Under the heading "Valuation," the policy states: "We will determine the value of Covered Property in the event of loss or damage . . . [a]t actual cash value as of the time of loss or damage . . . ."[2] (D.N. 53-1, PageID # 1044-45) The term "actual cash value" is not defined in the policy.

Arcadia argues that the umpire should be instructed to apply the broad evidence rule to determine the actual cash value of the damaged property in this case. (D.N. 53, PageID # 1030-

---

[2] This provision is subject to certain exceptions that do not appear to be applicable here.

31; D.N. 54) The broad evidence rule "is used to determine the actual cash value when th[at] term is undefined in a contract." *Whitehouse Condo. Grp., LLC v. Cincinnati Ins. Co.*, 569 F. App'x 413, 419 (6th Cir. 2014). The rule has been recognized by Kentucky courts. *Snellen v. State Farm Fire & Cas. Co.*, 675 F. Supp. 1064, 1068 (W.D. Ky. 1987) (citing *Am. States Ins. Co. v. Mo-Lex, Inc.*, 427 S.W.2d 236, 238 (Ky. 1968)). "Under th[e] rule, the trier of facts may consider any evidence logically tending to the formation of a correct estimate of the value of the insured property at the time of loss." *Mo-Lex*, 427 S.W.2d at 238. Such evidence may include

> the cost of restoration or replacement of the building less depreciation; the age of the property; the economic value of the property; the condition in which the property is maintained; the income derived from the building's use; the property's location; the degree of obsolescence, both structural and functional; the profit likely to accrue on the property; the material of which the building is composed; the market value; the opinions regarding value given by qualified witnesses; the potential gainful uses to which the building might have been or may be put; the building's value for purposes of rental; and any other facts disclosed by the evidence which may possibly throw light on the actual value of the building at the time of loss, including the property's salvage value, if any.

*Whitehouse*, 569 F. App'x at 419 (emphasis removed) (quoting *Dickler v. CIGNA Prop. & Cas. Co.*, 957 F.2d 1088, 1097 (3d Cir. 1992)).

The CSU policy does not define actual cash value, and CSU's counsel stated at oral argument that CSU does not object to application of the broad evidence rule. However, it is not clear that there is any need to determine actual cash value in this case. As indicated by the quoted passage above, the broad evidence rule comes into play when a method is needed for determining the actual cash value of an entire covered property. This is consistent with the CSU policy language, which states that "the value of *Covered Property*" will be determined at actual cash value. (D.N. 53-1, PageID # 1045 (emphasis added)) Since CSU opted to pay for repair of the damaged siding as opposed to the value of the covered properties (i.e., the buildings), there

6

does not appear to be any need to calculate actual cash value. To the extent such a calculation is necessary, the umpire will be directed to apply the broad evidence rule.

### 2. Matching

Arcadia maintains that it is entitled to have all the siding replaced to avoid "an unsightly speckled mess which unduly decreases the value of the property and the quite [sic] enjoyment of the property for its residents." (D.N. 53, PageID # 1018) It has submitted an affidavit by its purported roofing expert, Michael Mayor, in which Mayor opines that the repairs proposed by CSU are unacceptable. (*See* D.N. 23-3, PageID # 484 (stating that the damaged siding cannot "be repaired without replacing all of it" due to differences in size, color/aging, and thickness))

According to Arcadia, paragraphs (2) and (4) of the Loss Payment provision "give rise to the right to Match." (D.N. 53, PageID # 1025) It further asserts that "the law of Matching" requires CSU to pay for replacement of all the siding on all the buildings. (*E.g.*, D.N. 53, PageID # 1020) Arcadia's legal argument, however, is unconvincing. It relies on three dated cases from other jurisdictions and a Kentucky insurance regulation, none of which are persuasive.

#### a. 806 KAR 12:095

The regulation invoked by Arcadia pertains to "[u]nfair claims settlement practices for property and casualty insurance." 806 KAR 12:095. Section 9 of the regulation sets forth "Standards for Prompt, Fair, and Equitable Settlements Applicable to Fire and Extended Coverage Type Policies with Replacement Cost Coverage." It provides that "[i]f a loss requires replacement of items and the replaced items do not reasonably match in quality, color, or size, the insurer shall replace all items in the area so as to conform to a reasonably uniform

7

appearance." 806 KAR 12:095 § 9(1)(b). Arcadia's reliance on this regulation is misguided for several reasons.

First, as Arcadia concedes, the regulation cannot be enforced in a private action. (*See* D.N. 53, PageID # 1030) Section 2 of the regulation states:

> This administrative regulation establishes standards for the executive director in investigations, examinations, and administrative adjudication and appeals therefrom. A violation of this administrative regulation shall be found only by the executive director.[3] This administrative regulation shall not create or imply a private cause of action for violation of this administrative regulation.

806 KAR 12:095 § 2(3). This Court and the Eastern District of Kentucky have repeatedly declined to apply 806 KAR 12:095 in private litigation. *See The Woods Apartments*, 2013 U.S. Dist. LEXIS 105582, at *4 (citing cases from both districts and "agree[ing] . . . that 806 KAR 12:095 is an administrative regulation inapplicable to Plaintiffs' private cause of action").

Moreover, the regulation's matching provision applies to replacement cost policies—and as discussed above, the parties agree that the policy at issue here is an actual cash value policy. Notably, the section of the regulation pertaining to actual cash value policies does not mention matching. *See* 806 KAR 12:095 § 9(2). In short, the matching provision of 806 KAR 12:095 does not apply to this case. Nor does it establish that "[m]atching is required by Kentucky law," as Arcadia asserts. (D.N. 53, PageID # 1030)

     b.  *Gibson v. HUD*

Arcadia first cites *Gibson v. U.S. Department of Housing & Urban Development*, 479 F. Supp. 3 (M.D. Pa. 1978), in support of its position that cosmetic matching is required. (D.N. 71, PageID # 1331). However, *Gibson* is inapposite. It involved a flood insurance policy that

---

[3] There has apparently been a change in terminology that is not reflected in the regulation; "executive director" is defined by reference to Kentucky Revised Statutes § 304.1-050(1), which contains no definition of that term but defines "Commissioner" as "the commissioner of the Department of Insurance of [Kentucky]."

8

covered "direct loss by flood" and included replacement cost coverage. *Id.* at 4; *see id.* at 6. The covered property was damaged by floodwaters such that repair was possible but impractical due to the likelihood of future flooding; the dispute was whether the insured homeowners were entitled to reimbursement for the cost of reconstructing their house in another location or whether they should only be compensated for the cost of repairs. *See id.* at 4. The court concluded that the homeowners had lost an insured property right—"the right to use th[e] house as a residence"—as a result of the flood and that the policy contemplated "the possibility of securing a replacement dwelling." *Id.* at 6. The case did not involve cosmetic matching and is clearly distinguishable on the facts: Arcadia does not contend that unmatched siding renders its buildings uninhabitable, and its policy is not a replacement cost policy.

### c. *Mastin v. Sandy & Beaver Insurance Co.*

Unlike *Gibson*, *Mastin v. Sandy & Beaver Insurance Co.*, 461 N.E.2d 332 (Ohio Misc. 1983), discusses cosmetic matching, but it is hardly "a leading national case" on the issue, as Arcadia contends. (D.N. 71, PageID # 1331) Rather, *Mastin* is a two-paragraph decision, more than thirty years old, from a small-claims court in Ohio. It has been cited by a single court (which found it distinguishable) in an unpublished decision sixteen years ago. *See St. Paul Fire & Marine Ins. Co. v. Darlak Motor Inns, Inc.*, No. 3:97-cv-1559, 1999 U.S. Dist. LEXIS 23283, at *19-20 (M.D. Pa. Mar. 9, 1999). The insurers in *Mastin* refused to pay for replacement of vinyl flooring in the insured's kitchen after covered plumbing repairs required that a hole be cut in the existing floor. 461 N.E.2d at 332. Instead, they argued that they were only obligated to cover the cost of patching the floor. *Id.* Noting that the flooring was only sold in rolls (as opposed to individual tiles), the court concluded "that vinyl flooring cannot be said to be repaired if an obvious patch is left, and that the whole floor ought to have been replaced." *Id.* The court

Case 3:14-cv-00040-DJH-DW Document 78 Filed 09/30/15 Page 10 of 15 PageID #: 1472

reasoned that the insurers "[p]resumably . . . had inspected plaintiff's premises and knew that access to the plumbing was difficult and that plaintiff's floor would be expensive to replace," and they could have "adjust[ed] plaintiff's premiums accordingly"; thus, their contention that the cost of replacement was too high was unpersuasive. *Id.* at 332-33.

Aside from its limited precedential weight, *Mastin* is factually distinguishable. While cosmetic matching was deemed appropriate in *Mastin*, the court based its decision on the fact that there was no way to repair the floor without leaving an obvious patch, and thus the insurers should have anticipated that the floor would have to be replaced in the event of plumbing repairs. *See id.* Here, by contrast, there was no reason for CSU to expect that it would automatically be required to pay for all new siding on sixty-eight buildings in the event of hail damage, particularly since the policy does not include replacement cost coverage. *Cf. Darlak Motor Inns*, 1999 U.S. Dist. LEXIS 23283, at *20 (finding *Mastin* inapposite where insurer "had no reason to know that it would have to redecorate every room on a floor [of a hotel] even if only one of those rooms was damaged"). And unlike the vinyl flooring in *Mastin*, siding can be purchased in individual segments.

### d. *Holloway v. Liberty Mutual Fire Insurance Co.*

*Holloway v. Liberty Mutual Fire Insurance Co.*, 290 So. 2d 791 (La. Ct. App. 1974), is likewise distinguishable. In *Holloway*, the plaintiffs' home had water damage to the carpeting in a bedroom and adjacent hallway. *See id.* at 793. They presented proof—testimony of an interior decorator and a real estate agent—that replacement of all the carpeting in the bedroom wing of the house was necessary to avoid a significant decrease in property value. The court concluded that the plaintiffs were entitled to the cost of replacing all the carpet, not just the damaged portions. *See id.* at 794-95. However, the court relied on a Louisiana statute requiring that in

10

case of partial damage, an insurer must pay "'such amount . . . as [would] permit the insured to restore the damaged property to its original condition.'" *Id.* at 795 (quoting LSA-R.S. 22:695(B) and concluding "that replacement of carpeting in the entire bedroom wing of the plaintiffs' house was necessary to restore the damaged property to its original condition" in compliance with the statute). No such statute applies here.[4]

### e. Other Cases

Within the past few years, several courts have concluded that matching is required where an insurance policy refers to repairs or replacements "of like kind and quality," *National Presbyterian Church, Inc. v. GuideOne Mutual Insurance Co.*, No. 13-1847 (JDB), 2015 U.S. Dist. LEXIS 16539 (D.D.C. Feb. 11, 2015) (façade of church with some, but not all, limestone panels damaged by earthquake); or "comparable material and quality," *Cedar Bluff Townhome Condominium Association, Inc. v. American Family Insurance Co.*, 857 N.W.2d 290 (Minn. 2015) (twenty multi-unit residential buildings, more than half of which had three or fewer hail-damaged siding panels); or that a jury should decide whether such terms required matching, *see Trout Brook South Condominium Association v. Harleysville Worcester Insurance Co.*, 995 F. Supp. 2d 1035 (D. Minn. 2014) (hail damage to only some shingles on roofs of condo buildings); *Seamon v. Acuity*, No. A11-429, 2011 Minn. App. Unpub. LEXIS 1043 (Minn. Ct. App. Dec. 5, 2011) (wind damage to twenty-five percent of home's roof; brand and style of original shingles discontinued). Some of these cases involved loss payment language identical to that of the CSU policy at issue here. *See Nat'l Presbyterian Church*, 2015 U.S. Dist. LEXIS 16539, at *4; *Cedar Bluff*, 857 N.W.2d at 291.

---

[4] Kentucky had a similar statute at one time, but it was repealed in 1950. *See* Ky. Rev. Stat. § 298.120.

However, the policy in each case cited above was a replacement cost policy, not an actual cash value policy like the one at issue here. Arcadia's policy gives CSU the option of paying either the actual cash value of the damaged property (i.e., the building) or the cost of repairing or replacing the damaged property. (*See* D.N. 53-1, PageID # 1043, 1045, 1071) CSU's payment of $24,522.25 was intended to cover the cost of repairs, per subsection (2) of the Loss Payment provision. (*See* D.N. 53-1, PageID # 1043) Although the "like kind and quality" provision of subsection (4) thus does not apply (*see id.*), CSU acknowledges that it must cover "comparable siding . . . to replace the damaged siding." (D.N. 62, PageID # 1255) The amount of money required to satisfy this obligation is for the umpire to decide.

Finally, the Court notes that in a recent case similar to this one involving Arcadia's counsel and nearly identical arguments, this Court concluded that matching was not required. *See The Woods Apartments*, No. 2013 U.S. Dist. LEXIS 105582. The Court rejected the plaintiffs' contention that they were "entitled to replacement of the roof and siding of *all* the apartment buildings to achieve cosmetic matching," finding that it "would be unduly burdensome on Defendants and would essentially result in a windfall to Plaintiffs." *Id.* at *7. Although Arcadia contends that the Court later reversed its decision and was prepared to give a matching instruction at trial, the record does not reflect such a change. *See The Woods Apartments*, No. 3:11-CV-41-H, D.N. 121 (denying motion to reconsider as moot based on conference with counsel). Moreover, the policy at issue in *The Woods Apartments* was a replacement cost policy. *See* 2013 U.S. Dist. LEXIS 10552 at *6. Thus, even if the Court's reasoning changed, it would not apply to the actual cash value policy at issue here.

### C. CSU's Motion to Appoint Umpire

With respect to appointment of an umpire, the parties primarily disagree as to whether the person appointed should be an expert. Arcadia claims that a retired judge or other mediator would be the appropriate choice; it contends that any umpire with ties to the insurance industry is hopelessly biased. It further argues that the umpire will only need simple math to resolve the dispute. (*See* D.N. 23, PageID # 415 (asserting that once the Court decides whether matching is required, "a simple calculation can be made as to the number of boards needed to replace the existing siding," and "[f]rom there, it is just a matter of calculating based on the unit cost what the total cost will be of patching or replacing the siding")) However, while the appraisal provision in the policy does not expressly state that an umpire must have experience as an appraiser, it contemplates that the umpire will make an independent determination as to which appraiser's valuation is correct. (*See* D.N. 7-2, PageID # 23(providing that the appraisers "will submit their differences to the umpire" and "[a] decision agreed to by any two will be binding")) It is hard to imagine how the umpire could reach this decision without conducting his or her own appraisal or at least having sufficient knowledge and experience in appraising to evaluate the work of Refka and Michelson. Because some expertise is necessary in order to assess the cause of damage and amount of loss, the Court will choose from among the candidates proposed by CSU.

Arcadia's objections to these three candidates are largely without substance. Although it does appear that CSU's first nominee, Gilbert Arnold, should be ruled out based on his company's current engagement by CSU in another matter, none of the nominees is obviously

13

biased in favor of insurance companies, as Arcadia insists.[5] (*See* D.N. 50-1, PageID # 1218-19 (affidavit of Arcadia's counsel averring that Donan Engineering is involved in ongoing litigation as an expert for CSU))  Indeed, the only real objection articulated by Arcadia to the second candidate, Wayne Barnes, is that "it would be awkward" for Arcadia's appraiser and counsel "to deal with Mr. Barnes as the opposing adjuster in one case and as the Umpire in another case." (D.N. 23, PageID # 411)

With respect to the third candidate, Jeff Turley, Arcadia merely asserts that he "is another person whose personnel serve as 'independent adjusters' solely for insurance companies" and that "[t]he nomination of Mr. Arnold and Mr. Barnes belies the argument of [CSU] that Mr. Turley is in a position to be neutral." (*Id.*)  However, an appraiser's past association with insurance companies does not automatically disqualify him from serving as an umpire. *See Figi v. N.H. Ins. Co.*, 166 Cal. Rptr. 774, 778 (Cal. Ct. App. 1980) (declining to hold "that an appraiser is necessarily 'interested' in violation of [a California statute requiring 'competent and disinterested' appraisers] because he has done business with the insurance company in the past"); *see also Cont'l Ins. Co. v. Vallandingham & Gentry*, 76 S.W. 22, 25 (Ky. 1903) (noting that the fact that the appraiser selected by the insurance company "had served many times in that capacity before, and as many as three times before for one of the [insurers]," did not in itself indicate that the appraiser was biased).  And Arcadia does not dispute CSU's assertion that Turley has also represented insureds.  (*See* D.N. 23, PageID # 411)  Because he has extensive experience serving as an umpire and Arcadia has made only general objections regarding his supposed bias, the Court will appoint Jeff Turley to serve as umpire.

---

[5] Arcadia resorts to misrepresentation in support of this argument, attributing a customer review from a consumer-complaint website as "boast[ing] by Arnold's company, Donan Engineering, that Donan "works for the insurance company." (D.N. 23, PageID # 410; *see* D.N. 23-4, PageID # 538 (screenshot from www.pissed-consumer.com))

### III.     CONCLUSION

In accordance with the discussion above, it is hereby

**ORDERED** as follows:

(1)     Cincinnati Specialty Underwriters' Motion to Appoint an Umpire (D.N. 7) is **GRANTED**.  The Court appoints Jeff Turley to serve as umpire.

(2)     Arcadia's Motion and Memorandum Regarding Legal Issues Concerning the Meaning of the Governing Insurance Policy and CSU's Obligations (D.N. 53) is **GRANTED** insofar as Arcadia seeks application of the broad evidence rule.  To the extent a determination of actual cash value is necessary, the umpire shall apply the broad evidence rule in calculating that amount.  With respect to the issue of matching, Arcadia's motion is **DENIED**.

(3)     Within **ten (10) days** of the date of entry of this Memorandum Opinion and Order, the parties shall jointly contact the chambers of Magistrate Judge Dave Whalin to schedule a status conference regarding Arcadia's counterclaim.